**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DEANGELO BROTHERS, INC.** | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:CV-06-0466** |
| | : | **(CHIEF JUDGE VANASKIE)** |
| **DAVID G. CLARIUS** | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff DeAngelo Brothers, Inc. ("DBI") has moved for a preliminary injunction to restrain its former employee, Defendant David G. Clarius, from violating a "Non-Disclosure and Non-Competition Agreement."  While DBI has established a reasonable likelihood of prevailing on the merits, it has not demonstrated that breach of the agreement will cause the immediate irreparable harm necessary to warrant the extraordinary equitable relief sought.  Accordingly, the motion for a preliminary injunction will be denied.

## I. BACKGROUND

### A. Procedural History

In late December of 2005, DBI learned that Clarius, who had left the employ of DBI over 14 months earlier, was performing storm water maintenance work for Wal-Mart Stores, a significant DBI account before Clarius left DBI.  DBI, through counsel, wrote to Clarius in January of 2006, asserting that Clarius was in breach of a non-disclosure and non-competition

agreement signed by Clarius during his employment with DBI.  On February 24, 2006, after Clarius refused to suspend his storm water maintenance work with Wal-Mart, DBI commenced this action by filing a complaint in equity in the Court of Common Pleas of Luzerne County.  On March 2, 2006, DBI petitioned the Luzerne County Court for preliminary injunctive relief.  The following day, Clarius, a citizen of the State of Florida, removed the litigation to this Court on the ground that it involved citizens of different states and an amount in controversy exceeding $75,000.

DBI did not immediately renew its request for preliminary injunctive relief in this Court.  Instead, it elected to "await [t]he outcome of the bids it had submitted to WAL-MART for storm water maintenance work in March of 2006 before requesting the scheduling of a preliminary injunction hearing by this Court."  (Plaintiff's Proposed Conclusions of Law (Dkt. Entry 18) at ¶ 22.)  At a case management conference conducted on May 5, 2006, after DBI learned that it had not received any Wal-Mart work, DBI requested the scheduling of a hearing on its request for preliminary injunctive relief.  As an accommodation to defense counsel's trial schedule, however, DBI "agreed to refrain from requesting that the hearing be scheduled in May. . . ."  (Id. at ¶ 24.)  The evidentiary hearing was conducted on June 29 and 30, 2006.

In connection with the hearing, both parties submitted proposed findings of fact, annotated with the opposing party's position as to whether each proposed finding was disputed or undisputed.  The parties also presented legal briefs and proposed conclusions of law.  The

matter is ripe for decision.

### B.  Findings of Fact

1.  DBI is a Pennsylvania corporation with its corporate headquarters located at 100 North Conahan Drive, Hazleton, Pennsylvania.

2.  Clarius is a competent, adult individual with an address of 265 S.E. Todd Avenue, Port St. Lucie, Florida  34983.

3.  From 1994 until November 19, 1999, Clarius worked for Aquagenix out of that entity's Fort Lauderdale, Florida office.  Aquagenix was involved in the business of providing maintenance services for storm water management systems.

4.  Clarius's last position with Aquagenix was the Branch Manager of the Fort Lauderdale office.

5. DBI is engaged in several areas of business, including the provision of comprehensive storm water maintenance services to customers such as Wal-Mart Stores, Inc. ("Wal-Mart").

6.  In November of 1999, DBI acquired the assets of Aquagenix, which was based in Florida.

7.  Wal-Mart was a customer of Aquagenix before November 19, 1999.

8.  Prior to November 19, 1999, Clarius was the employee at Aquagenix who was the primary contact person with Wal-Mart.

9.  Prior to November 19, 1999, Clarius had a pesticide applicator's license in the state of Florida.

10.  Prior to November 19, 1999, Clarius had training and education in aquatic weed control, aquatic plant culture, and re-vegetation.

11.  On or about November 19, 1999, Clarius attended a meeting at the Hilton Hotel in West Palm Beach, Florida conducted by officials of DBI.

12.  At that meeting, Clarius was supplied with a copy of DBI's Non-Disclosure and Non-Competition Agreement (the "Agreement"), and was informed that executing the Agreement was a condition of employment with DBI.

13.  DBI requires all its employees to execute a non-competition agreement, regardless of the employee's position with DBI.

14.  On November 19, 1999, Clarius applied for employment with DBI.

15.  As part of the DBI employment application process, Clarius signed a form that, in relevant part, stated:

> I agree and understand that should I be employed I will not at any time or in any manner, either directly or indirectly, divulge, disclose or communicate to any person, firm or corporation in any manner whatsoever any confidential information concerning any matters affecting or relating to the business of the Employer.  I further understand that I will be asked to sign a Confidentiality/Non-Compete Agreement as a condition of employment. [Emphasis added.]

16.  Clarius commenced employment with DBI on November 19, 1999.

17.  Clarius did not execute the Agreement containing the restrictive covenants at the time he commenced his employment with DBI.

18.  On December 27, 1999, without having signed the Agreement, Clarius submitted the following document to DBI:

> Please except [sic] this letter as two weeks formal written notice of my resignation.  For reasons both personal and professional I feel it necessary to end my employment with Aquagenix/DeAngelo Bros. Thank you for your cooperation in this matter.

19.  Three days later, on December 30, 1999, Clarius rescinded his resignation.  At no time prior to October 1, 2004 did Clarius leave the employ of DBI.

20.  On January 13, 2000, Clarius executed the Agreement containing the restrictive covenants at issue here.

21.  The Agreement provides, in relevant part, as follows:

> C.  Prior to the commencement of employment, Employer and Employee agreed that as a condition of such employment, Employee would be required to, and would in fact agree to certain terms with respect to the non-disclosure of information concerning the business of the employer and non-competition with the Employer during his/her employment, as well as in the event said employment is terminated . . . .

> D. Following careful consideration and the opportunity to review the provisions of this Agreement with Counsel of employee's choice, the employee is willing to make and confirm certain agreements with the Employer as are contained in this Agreement.

> NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties do hereby agree as follows:

5

1.  Employer and Employee each agree that the statements contained in the Background paragraphs above are true and correct.  Consequently, in consideration of the employment being offered to the Employee by the Employer and other good and valuable consideration, employee agrees to be bound by the terms of this Agreement.  Employee further acknowledges that this Agreement was presented to Employee by Employer for his/her review and signature on or before the date employment commenced.  In order that the Employee have additional time to review the Agreement, personally and with an attorney if he/she so chooses the Employee understands that any and all offers of employment extended to the Employee is conditional until such time as the Employee executes and returns this Agreement to the Employer, in which case will not be more than thirty (30) days from the Employee's original date of employment.

2.  Employee's obligations to Employer are special, unique and extraordinary and during the course or employment he/she will receive proprietary information which is confidential and which greatly affects the effective and successful conduct of the business of the Employer and the Employer's goodwill.  Such proprietary information is provided to Employee in confidence due to his/her employment with Employer and his/her need to know such information in order to completely and competently perform his/her duties and obligations on behalf of the Employer.  As used herein "proprietary information" shall mean any and all customer lists or other trade secrets of other confidential information pertaining to the financial condition, business affairs or business prospects of the Employer or the Employer's affiliates . . . .

4.  [D]isclosure of any such proprietary or confidential information, whether directly or indirectly, including copying or removing of any records of the Employer except in the normal course of business or with the express consent of Employer would be deemed a material breach of the Agreement.

5.  The parties acknowledge that as prime consideration for Employee's employment by the Employer, the Employee has agreed and represented to the Employer that <u>for a period of twenty-four (24) months after the termination of Employee's employment, whether the Employee voluntarily or involuntarily resigns or is terminated by the Employer for no reason or for any reason, the Employee will not, directly or indirectly, engage in activities for any person, business concern or other entity that competes with the Employer in any area of the Employer's Business in which the Employee has had any significant responsibilities with the Employer</u>

6

during the time of his/her employment, either for his/her own benefit or for the benefit of any other person, business concern or other entity whatsoever, within any county, district or parish in the continental United States in which the Employee worked while employed by the Employer and/or in the case of management employees, within the entire continental United States expressly including, but not limited to the duties which the Employee has conducted or will conduct himself/herself on behalf of the Employer.  This includes the covenant that during this time frame, the Employee will not become an officer, employee, agent, shareholder, partner, director, consultant or otherwise affiliated with any person, business concern or other entity that competes with Employer in any such area of the Employer's Business within any such county, district or parish of any such state, province or district unless receiving prior written approval of the Employer's President.

In addition, and without limiting the generality of the previous paragraph, Employee specifically agrees that for a period of twenty-four (24) months after the termination of his/her employment, . . . the Employee will not, directly or indirectly, either for his/her own benefit or for the benefit of any other person, business concern or other entity whatsoever, engage in any activities similar to activities engaged in by Employee while in the employ of Employer for any person, firm, company, corporation or governmental entity, which was a customer or client of employer during the last twelve (12) months in which Employee was employed by Employer.

6.  The Employee further agrees that during the period of twenty-four (24) months immediately after the termination of his/her employment with the Employer, . . . he/she will not . . . make known or divulge the names or addresses of any of the customers or clients or prospective customers or clients of the Employer at the time he/she entered the employ of Employer or with whom he/she became acquainted after entering the employ of Employer, to any person, business concern or other entity, and that he/she will not, directly or indirectly, either for himself/herself or for any other person, firm, company or corporation, call upon, solicit, divert, or take away or attempt to solicit, divert or take away any of the customers, clients or any prospective customers or clients, of the Employer upon whom he/she called or whom he/she solicited or to whom he/she catered or with whom he/she became acquainted with during his/her employment with the Employer.

7.  The Employee and Employer acknowledge and agree that the duration of the covenants set forth in paragraphs 5 and 6 have been determined by the

7

parties to be the minimum period of time necessary to secure protection of the Employer's business.

8.  The Employee further agrees that he/she will not, during the twenty-four (24) month period subsequent to the date of the termination of Employee's employment, . . . hire or engage the services of, or engage in a business enterprise with, any person who was an employee of the Employer during Employee's employment period preceding termination, nor will Employee induce any such person to terminate his/her employment with the Employer, or recommend that such person be hired, engaged or induced to terminate his/her employment with the Employer without prior written approval of the Employer's President. This prohibition of hiring, solicitation or inducement by the Employee is applicable to, and shall include, all employees, consultants, or subcontractors who are engaged by the Employer during the time of the Employee's employment with the Employer.

.    .    .

11.  The parties acknowledge that any breach by Employee of any of the provisions contained in any of Paragraphs 3, 4, 5, 6, or 8 of this Agreement would result in immediate or irreparable injury to Employer not properly or completely compensable by damages in an action at law; and that the provisions of this Agreement are necessary for the protection of the Employer and that any breach of this agreement by employee shall entitle the employer, in addition to any other legal remedies available to it, to institute and prosecute in any Court of competent jurisdiction, either in law or in equity, actions to obtain damages for any breach of this Agreement or to enforce the specific performance of this Agreement by Employer or to enjoin Employee from activities in violation of this Agreement, and to recover all costs of such action, including reasonable attorneys fees.  All of the above rights and remedies of the Employer hereunder shall be cumulative and not alternative.  In the event of any breach by Employee of any provision contained in paragraphs 5, 6 or 8 of this agreement the time period(s) contained in any such provision(s) shall be extended for a period equal to the period of the breach. [Emphasis added.]

22.  The Agreement had been presented to Clarius when he applied for employment

with DBI on November 19, 1999.

23.  Clarius knew when he applied for employment with DBI that execution of the Agreement was a condition of employment with DBI.

24.  Clarius executed the Agreement more than thirty (30) days after his original date of employment with DBI.

25.  Clarius signed the Agreement because of the threat to terminate him unless he signed it.

26.  While employed by DBI, Clarius served as the DBI employee primarily responsible for the institution and development of DBI's storm water maintenance program, as well as for managing DBI's relationship with Wal-Mart and other purchasers of storm water maintenance services.

27.  During Clarius' employment with DBI, he received training, certification, and licensing as a qualified storm water management inspector, and also received a restricted pesticide license, all at the expense of DBI, in order to service DBI's storm water maintenance accounts with Wal-Mart and other customers.

28.  During the time Clarius was employed with DBI, his position and responsibilities with respect to the storm water maintenance services that DBI supplied to Wal-Mart increased from salesman to regional sales manager to national sales manager.

29.   During the time Clarius was employed with DBI, the annual gross revenues which DBI received from Wal-Mart for storm water maintenance work increased from approximately two thousand dollars ($2,000) in 1999 to almost six million dollars ($6,000,000) in 2004.

30.   In years 2003 and 2004, DBI had state-wide contracts with Wal-Mart to perform storm water systems maintenance at Wal-Mart sites in the following 12 states: Florida, Alabama, Texas, Mississippi, Georgia, Arkansas, Louisiana, South Carolina, Pennsylvania, Washington, Tennessee, and Oregon.

31.   During 2004, Wal-Mart voiced a number of complaints concerning DBI's performance of storm water systems maintenance.

32.   DBI provided Clarius with additional clerical staff support to attempt to address Wal-Mart's concerns.

33.   Even after Clarius received additional staff support, Wal-Mart continued to complain of performance at various Wal-Mart locations.

34.   Complaints of deficient performance were made to Clarius, who in turn relayed those complaints to his superiors at DBI.

35.   In an email dated June 9, 2004, B.J. Hicks, the Wal-Mart Environmental Compliance Manager, informed Clarius that DBI's performance in Pennsylvania was unacceptable.  Her email continued:

> I absolutely need this issue corrected immediately.  I will give you
> two weeks to get to each location in PA and perform the work

described in our contract.  If you cannot accomplish this, I will have to terminate this contract and get another contractor on board who can.  Please let the people in charge of your PA branch know that this type of service is not acceptable to Wal-Mart and will not be tolerated in the future.  <u>These types of issues threaten the entire Regional Maintenance Program and the continued relationship between [DBI] and Wal-Mart</u>. [Emphasis added.]

Clarius forwarded this email to his superiors at DBI, including the Company President, Paul DeAngelo.

36.  By email dated August 13, 2004, Hicks informed Clarius that she was cancelling the storm water maintenance contract with DBI for Wal-Mart locations in the Commonwealth of Pennsylvania because problems previously brought to DBI's attention had not been addressed.

37.  As a result of the cancellation of the Wal-Mart business in Pennsylvania, Paul DeAngelo, DBI's President, became active in overseeing the Wal-Mart account. DeAngelo asked Clarius to set up a meeting with Hicks.

38.  The meeting with Hicks occurred on September 14, 2004.  During the course of the meeting, Hicks complained of deficient performance by DBI at a number of Wal-Mart locations.

39.  Immediately after the meeting, Clarius informed DeAngelo that he was resigning from DBI.

40.  Clarius actually had decided to leave DBI in August of 2004, and had entered into an agreement with Dennis Castner, a former subcontractor of DBI, to enter into the storm water maintenance business and solicit work from Wal-Mart.  While Clarius was still employed with

DBI, Clarius and Castner caused to be incorporated A & D Storm Water & Environmental Services ("A & D").

41.  Clarius remained in the employ of DBI until October 1, 2004.  While still on the payroll at DBI, Clarius caused to be submitted to Wal-Mart proposals to perform storm water system maintenance work.

42.  A & D was awarded storm water maintenance work during 2005 for Wal-Mart stores located in Florida, Arkansas, Alabama, Louisiana, Mississippi, and Texas.  DBI had performed storm water maintenance work for Wal-Mart in those states during 2004.

43. DBI replaced Clarius with Ancer Boatman, who had experience with weed control on railroad lines, but did not have experience with maintenance of storm water systems.

44.  Wal-Mart continued to complain of DBI's performance of storm water system maintenance services after the departure of Clarius.  Furthermore, Hicks was not comfortable dealing with Boatman.  In an email dated October 27, 2004, Hicks detailed problems at several Wal-Mart locations.  Hicks concluded this message with the following:

> Any change you're making to improve our service don't [sic] seem to be very effective.  Since We have already paid for this work, I think you should get it done, don't you?

45.  In an email to Boatman dated November 3, 2004, Hicks wrote:

> Diane @ the store has told me that the front side of the pond is being maintained, but the back is not.  I assure you that I did not agree to have just one side of ANY pond maintained, but it seems this is happening at more than one location.

12

46.  In an email to Boatman dated November 5, 2005, Hicks wrote that she was learning that ponds subject to maintenance agreements with DBI were being denuded of vegetation, resulting in erosion and regulatory violations for Wal-Mart.

47.  On November 19, 2004, Hicks forwarded to Boatman an email from a Wal-Mart inspector, who found that very few of the storm water maintenance systems at the 35 stores located throughout Georgia had been maintained properly by DBI.

48.  On December 2, 2004, DBI made a presentation to Wal-Mart to resolve concerns about its performance.  Hicks did not attend the presentation.

49.  Although DBI believed that they had satisfactorily addressed Wal-Mart's concerns, Hicks was unconvinced.

50.  DBI was not awarded <u>any</u> storm water system maintenance work for Wal-Mart during 2005.  In addition to awarding contracts to A & D for stores located in Florida, Alabama, Louisiana, Mississippi, Texas, and Arkansas, Wal-Mart awarded substantial work to Retention Pond Services in states where DBI had previously performed services for Wal-Mart.

51. On or about October 6, 2005, Clarius incorporated DGC Environmental Services, Inc. ("DGC") to perform storm water maintenance service.

52.  In late December of 2005, DBI learned that Clarius had been performing storm water system maintenance work for Wal-Mart.

13

53.  By letter dated January 6, 2006, DBI wrote to Clarius demanding that he cease and desist from providing or offering to provide storm water maintenance in violation of the terms of the Agreement.

54.  In March of 2006, DGC, through Clarius, submitted bids to Wal-Mart, offering to perform storm water maintenance work in the states of Florida, Alabama, Mississippi, and Louisiana.

55.  DBI also submitted bids for storm water maintenance work for Wal-Mart for fifteen (15) states, including Florida, Alabama, Mississippi, and Louisiana.

56.  In April of 2006, DGC was awarded the storm water maintenance work for all Wal-Mart stores in Florida and Alabama.

57.  DBI was <u>not</u> awarded any storm water management work by Wal-Mart for any state, despite the fact that it had provided such services to Wal-Mart in a number of states from 1999 through 2004.

58.  DGC is currently providing storm water maintenance services to Wal-Mart for stores in Florida and Alabama.

59.  In documents which accompanied the bids submitted by DGC to Wal-Mart for storm water maintenance services, Mark Whitney is identified as the "Project Manager" of DGC

60.  Whitney is a former employee of DBI.

61.   Clarius, individually and/or through DGC, has engaged R&M Environmental Specialists, Inc. ("R&M") as a subcontractor with respect to storm water maintenance work for Wal-Mart in Florida.

62.   R&M was a DBI subcontractor with respect to storm water maintenance work which DBI supplied to Wal-Mart.

63. Wal-Mart elected not to award DBI any state-wide contracts in 2005 due to  DBI's poor performance on its previous state-wide contracts and due to the fact that DBI's bids for state-wide contracts in 2005 included price averaging (same prices for all locations in the state), rather than individual prices per location.

64.   DBI was not awarded any contracts from Wal-Mart in 2006 for various reasons, including past poor performance of storm water treatment maintenance for Wal-Mart under previous contracts.

65.   Of the twelve states DBI had state-wide contracts from Wal-Mart for the year 2004, Clarius submitted proposals for only 4 of those states and was awarded contracts for only two states for the year 2006.

66.   If Clarius or DGC was not available to conduct storm water maintenance work for Wal-Mart for the remainder of 2006, Wal-Mart would not select DBI to do the work in place of Clarius or DGC

67.  The value of the storm water maintenance work performed by A & D for Wal-Mart during 2005 approximated $2 million.

68.  The value of the work being performed by DGC for Wal-Mart during 2006 approximates $1.5 million.

69. The only DBI customer for which DGC is providing storm water system maintenance services is Wal-Mart.

70.  Retention Pond Services has been awarded much of the Wal-Mart work that DBI had performed.  Clarius had nothing to do with the award of Wal-Mart storm water systems maintenance work to Retention Pond Services.

II.   **DISCUSSION**

A preliminary injunction is "'an extraordinary remedy' and 'should be granted only in limited circumstances.'" Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (quoting American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994)).  Moreover, "[a]lthough [Plaintiff's] request for injunctive relief is based on a state law cause of action (enforcement of restrictive covenants in an employment agreement), this Court must utilize a federal standard in evaluating whether preliminary injunctive relief is appropriate." Dice v. Clinicorp, Inc., 887 F. Supp. 803, 808 (W.D. Pa. 1995) (citing Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989)).  Under the governing law in federal court, DBI must show the following:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

Kos Pharmaceuticals, 369 F.3d at 708.  Failure to establish either a likelihood of success on the merits or irreparable harm warrants denial of the extraordinary remedy of a preliminary injunction.  Mettler-Toledo, Inc. v. Acker, 908 F. Supp. 240, 245 (M.D. Pa. 1995).

### A.    Likelihood of Success on the Merits

Under Pennsylvania law,[1] non-competition agreements in the employment context are enforceable if:

> (1) ancillary to the employment relationship; (2) supported by adequate consideration; (3) reasonably limited in time and geographic scope; and (4) reasonably designed to safeguard a legitimate interest of the former employer.

Fishkin v. Susquehanna Partners, G.P., No. Civ. A. 03-3766, 2006 WL 1517397, at *9 (E.D. Pa. May 31, 2006). Thus, Pennsylvania law "'permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer.'" Hess v. Gebhard & Co., 808 A.2d 912, 917 (Pa. 2002) (quoting Sidco Paper Co. v. Aaron, 351 A.2d 250, 254 (Pa. 1976)).

---

[1]The Agreement contains a choice of law provision, specifying that it is governed by Pennsylvania law.  (Agreement, ¶ 12.)  Moreover, the parties agree that Pennsylvania substantive law applies in this case.

Because a non-competition agreement forecloses a former employee from pursuing his or her chosen vocation, restrictive covenants are disfavored in Pennsylvania as a restraint on trade. Such covenants, therefore, are to be construed narrowly. Id. at 922. Moreover "'general covenants not to compete, which are ancillary to employment will be subjected to a more stringent test of reasonableness than that which is applied to such restrictive covenants ancillary to the sale of a business.'" Id. at 920 (quoting Hayes v. Altman, 266 A.2d 269, 271 (Pa. 1970)). The court "must 'balance the employer's protectable business interest against the oppressive effect on the employee's ability to earn a living in his or her chosen profession, trade, or occupation.'" Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107, 116 (3d Cir. 2003) (quoting Hess, 808 A.2d at 923).

"The party challenging the validity of the agreement bears the burden of proving that the terms of the non-compete and other restrictions are not supported by consideration and/or are unreasonable." Fisher Bio Services, Inc. v. Bilcare, Inc., No. Civ. A. 06-567, 2006 WL 1517382, at *10 (E.D. Pa. May 31, 2006)(citing John G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164, 1169-70 (Pa. 1977)). Accord Coventry First LLC v. Ingrassia, No. Civ. A. 05-2802, 2005 WL 1625042, at *7 (E.D. Pa. July 11, 2005). Clarius argues that the Agreement is not enforceable because (a) it was entered into several weeks after his employment with DBI commenced and was not supported by additional sufficient consideration; (b) its restrictions are

18

not reasonably necessary for DBI's protection; and (c) it is not reasonably limited as to both time and territory.  These contentions will be addressed seriatim.

Citing George W. Kistler, Inc. v. O'Brien, 347 A.2d 311 (Pa. 1975), Clarius argues that the non-competition Agreement is unenforceable because it was not executed until weeks after he began his employment with DBI.  In this regard, he relies upon the general rule that continuation of employment at the time the non-competition agreement is executed is insufficient consideration for the covenant not to compete.  Id. at 316.

As pointed out by DBI, however, Pennsylvania law also recognizes that "[i]f a restrictive covenant 'is an auxiliary part of the taking of employment and not a later attempt to impose additional restrictions on an unsuspecting employee, a contract of employment containing such a covenant is supported by valid consideration and is therefore enforceable.'" Fisher Bio Services, 2006 WL 1517382, at *10 (quoting Modern Laundry & Dry Cleaning Co. v. Farrer, 536 A.2d 409, 411 (Pa. Super. Ct. 1988)).  Illustrative of this principle is Beneficial Finance Co. of Lebanon v. Becker, 222 A.2d 873 (Pa. 1966).  The non-compete agreement in that case was not fully executed until 11 days after Becker commenced his employment.  The evidence revealed, however, that all of the plaintiff's employees were required to sign such a non-compete agreement, and that Becker was aware of this fact when he accepted employment. The court concluded:

> It would be a far too narrow construction of 'ancillary'
> if we held that a contract of employment was not

19

> auxiliary to the taking of employment when the
> contract was prepared the day the employee
> commenced work, signed by the employee two days
> later, and accepted by the out-of-state parent
> corporation nine days after that.  As long as the
> restrictive covenants are an auxiliary part of the
> taking of regular employment, and not an after-
> thought to impose additional restrictions on the
> unsuspecting employee, a contract of employment
> containing such covenants is supported by valid
> consideration, and is therefore enforceable.

Id. at 876.

In the matter sub judice, Clarius was presented with a copy of the non-competition

agreement that he eventually executed prior to accepting employment with DBI.  Moreover, the

employment application executed by Clarius acknowledged his understanding that he would be

asked to agree to a non-competition covenant as a condition of employment.  During the

preliminary injunction hearing, Clarius confirmed his understanding of the necessity to execute

the non-competition agreement as a condition of employment. The Agreement itself recites that

he was required to execute the agreement as a condition of employment, with the execution of

the agreement being deferred only to allow thorough review by Clarius and, if he so chose, an

attorney.  Finally, DBI required all employees, regardless of position, to agree to the restrictive

covenants as a condition of employment.

Thus, this is not a case of imposing on an unsuspecting employee a restrictive covenant

after the employment relationship has been formed.  Instead, the Agreement was understood to

be an integral term of the parties' contractual relationship at its inception.[2]   Accordingly, the

restrictive covenants at issue in this case are ancillary to the employment relationship, with the

taking of employment affording sufficient consideration to create a binding agreement.  See

Modern Laundry & Dry Cleaning Co. v. Farrer, 536 A.2d 409, 411 (Pa. Super. Ct. 1988).[3]

---

[2]Kistler is plainly distinguishable.  In Kistler, a contractual relationship that did not include any restrictive covenant was formed before the employee began working.  In Kistler, the restrictive covenant was imposed on the employee weeks after the parties had assented to the essential terms of the employment relationship.  Here, by way of contrast, Clarius knew that his employment with DBI was conditioned upon his execution of the Agreement.  That he was afforded time to consider whether to accept the condition does not change the fact that execution of the Agreement was an essential condition of employment with DBI.

[3]Clarius argues that the Agreement itself renders the restrictive covenants unenforceable because he did not sign the Agreement until more than 30 days after he began working for DBI.  In support of this argument, he relies upon the following provision in the first numbered paragraph of the Agreement:

> In order that the Employee have additional time to review the
> Agreement, personally and with an attorney if he/she so chooses
> the Employee understands that any and all offers of employment
> extended to the Employee is conditional until such time as the
> Employee executes and returns this Agreement to the Employer, in
> which case will not be more than thirty (30) days from the
> Employee's original date of employment.

This clause was obviously intended for the benefit of DBI, and DBI's failure to enforce it cannot be used by Clarius to avoid his obligations under the Agreement.  Cf. Turk v. D. Katz & Sons, Inc., 385 A.2d 583, 587 (Pa. Super. Ct. 1978)(failure of purchaser to enforce condition that benefitted only the purchaser did not entitle the seller to renege on its contractual obligations). The fact that DBI continued the employment of Clarius beyond 30 days without insisting upon execution of the Agreement did not eliminate execution of the Agreement as a condition for conversion of provisional employment to permanent employment.  This conclusion is reinforced by Clarius' testimony that he was told he would be fired if he did not sign the Agreement.

(continued...)

Clarius contends that, even if there is adequate consideration for the restrictive covenants contained in the Agreement, the non-competition provisions are unenforceable because they are not reasonably necessary for the protection of DBI.  The Supreme Court of Pennsylvania has recognized that "an employer may not enforce a post-employment restriction on a former employee simply to eliminate competition *per se*; the employer must establish a legitimate business interest to be protected."  Hess, 808 A.2d at 918.  "The presence of a legitimate, protectable business interest of the employer is a threshold requirement for an enforceable non-competition covenant."  WellSpan Health v. Bayliss, 869 A.2d 990, 997 (Pa. Super.  Ct. 2005).  "Such interests generally include trade secrets, confidential information, goodwill, and unique or extraordinary skills."  Keystone Dedicated Logistics Co. v. Bartmess, 133 Fed. Appx. 817, 819 (3d Cir. 2005).

In this case, DBI's President testified that the non-competition provisions of the Agreement are intended to protect customer goodwill and confidential business information.  In particular, he explained that the non-competition agreement was intended to protect the goodwill established between DBI and customers, such as Wal-Mart, with whom employees, such as Clarius, develop close relationships while working for DBI.

---

[3](...continued)
Clarius may not now avoid the effect of the restrictive covenants merely because DBI elected to waive the deadline for execution of the Agreement.

"Goodwill is a 'business's positive reputation' arising from a company's investment in developing customer relationships expected to continue into the foreseeable future." Plate Fabrication & Machining, Inc. v. Beiler, No. Civ. A. 05-2276, 2006 WL 14515, at * 7 (E.D. Pa. Jan. 3, 2006). "A business's goodwill is considered a protectable interest even when the goodwill has been acquired through the efforts of an employee." WellSpan Health, 869 A.2d at 997. Thus, "[a]n employer's right to protect, by a covenant not to compete, interest in customer goodwill acquired through the efforts of an employee is well-established in Pennsylvania." Sidco Paper Co. v. Aaron, 351 A.2d 250, 252-53 (Pa. 1976).

DBI has clearly established that the non-competition provisions of the Agreement safeguard its legitimate business interests. DBI's president explained that the purpose of the non-compete clause is to allow DBI a period of time to have a new employee establish the same type of relationship with its customers that the former employee enjoyed. It has been recognized that an employer may seek to protect customer goodwill by having "a limited amount of time to enable replacements to establish the same relationships, goodwill and effectiveness that the former . . . employee would be able to use to compete with [his former employer] only because of the opportunities provided to him by [the employer]." Fishkin v. Susquehanna Partners, G.P., No. Civ. A. 03-3766, 2006 WL 1517397, at *10 (E.D. Pa. May 31, 2006).

The non-competition provisions of the Agreement are plainly designed to safeguard business interests that an employer is entitled to protect.  Indeed, courts applying Pennsylvania law have routinely upheld restrictive covenants when confronted with a former employee seeking to solicit business from his or her former employer.  See, e.g., Plate Fabrication & Machining, supra, 2006 WL 14515, at *8.

Clarius maintains that the non-competition provisions of the Agreement are nonetheless unenforceable because they are not reasonably limited in both time and territory.  Even if the reach of the provisions proves to be greater than required, however, "a restrictive covenant with protections broader than necessary to protect the employer's legitimate business interest is not per se unenforceable and void."  Id. at * 5.  As explained in Hess, 808 A.2d at 920:

> When . . . the covenant imposes restrictions broader than
> necessary to protect the employer, we have repeatedly held that a
> court of equity may grant enforcement limited to those portions of
> the restrictions that are reasonably necessary for the protection of
> the employer.

Thus, for example, the court may limit the geographic reach of a restrictive covenant to less than the area set forth in the agreement itself.  See, e.g., Coventry First, LLC v. Ingrassia, No. Civ. A. 05-2802, 2005 WL 1625042, at *9-10 (E.D. Pa. July 11, 2005) (modifying restrictive covenant to encompass only employee's former territory).

In this case, it may be that the nationwide ambit of the non-competition provision is "broader than necessary to protect the employer's legitimate business interests. . . ."  Plate

24

Fabrication & Machining, supra, 2006 WL 14515, at *5.  Such a conclusion, however, does not preclude enforcement of the restrictive covenant for a more limited area.  In this regard, limiting the restrictive covenant to the Southeastern United States and/or storm water maintenance customers of DBI at the time that Clarius left DBI's employ may suffice to protect DBI's legitimate interests.  That the clause as drafted is broader than necessary to protect DBI, however, does not undermine the conclusion that DBI has shown a reasonable likelihood of prevailing on the merits.[4]  To hold otherwise would allow Clarius "to profit, at the expense of his former employer, from his wrongful and inequitable conduct."  Sidco Paper Co., 351 A.2d at 255.

In summary, the non-competition provisions of the Agreement are enforceable to the extent reasonably necessary to protect DBI's legitimate business interests.  It is clear that Clarius has engaged in conduct in breach of the non-competition agreement by soliciting Wal-Mart and undertaking storm water maintenance work for it in the Southeastern United States within two (2) years of the termination of his employment with DBI.  Accordingly, DBI has shown a reasonable likelihood of prevailing on the merits.

### B.    Irreparable Harm

---

[4]Clarius has not articulated why a two-year restriction on competition would be unreasonable as to duration.  Signficantly, Pennsylvania courts have sustained restrictive covenants of greater duration.  See, e.g., John G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164, 1170 (Pa. 1977) (restrictive covenant of three years in duration reasonably necessary to enable employer "to strengthen and reaffirm . . . business contacts").

It is not enough, of course, for DBI to show a likelihood of prevailing on the merits.

Absent a showing of irreparable harm, DBI is not entitled to extraordinary interim injunctive

relief.  See Mettler-Toledo, Inc. v. Acker, 908 F. Supp. 240, 245 (M.D. Pa. 1995).  As explained

by our Court of Appeals in Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91-92 (3d Cir.

1992):

> In order to demonstrate irreparable harm the plaintiff must
> demonstrate potential harm which cannot be redressed by a legal
> or an equitable remedy following a trial.  The preliminary injunction
> must be the *only* way of protecting the plaintiff from harm. . . .
>
> Establishing a risk of irreparable harm is not enough.  A plaintiff
> has the burden of proving a 'clear showing of immediate
> irreparable injury.'  The 'requisite feared injury or harm must be
> irreparable – not merely serious or substantial,' and it 'must be of a
> peculiar nature, so that compensation in money cannot atone for
> it.' [Emphasis in original.]

And as explained in Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994):

> The key word in this consideration is *irreparable*.  Mere injuries,
> however substantial, in terms of money, time and energy
> necessarily expended in the absence of a stay, are not enough.
> The possibility that adequate compensatory or other corrective
> relief will be available at a later date, in the ordinary course of
> litigation, weighs heavily against a claim of irreparable harm.
> [Emphasis in original.]

"In addition, the claimed injury cannot merely be possible, speculative or remote."  Dice v.

Clinicorp, Inc., 887 F.Supp. 803, 809 (W.D. Pa. 1995).  Finally, there must be a causal

relationship between the alleged irreparable harm and the purportedly wrongful conduct.  See

Clarke Transportation Services, Inc. v. Haskins, Civil A. No. 06-785, 2006 WL 1620175, at *2-3

(E.D. Pa. June 8, 2006).

Ordinarily, "'loss of control of reputation, loss of trade and loss of goodwill'" may suffice

to establish irreparable injury.  Id. at * 2 (quoting Pappan Enter., Inc. v. Hardee's Food Sys.,

Inc., 143 F.3d 800, 805 (3d Cir. 1998)).  This, however, is not the ordinary case.

Typically, an employer seeks preliminary injunctive relief almost immediately after the

employment relationship is severed.  In this case, however, DBI did not pursue in earnest

preliminary injunctive relief until more than 18 months after Clarius left its employ and began

competing with DBI, and only after Wal-Mart had selected Clarius' company to perform storm

water maintenance services in Florida and Alabama.  DBI made a deliberate choice not to seek

to prevent Clarius from bidding on Wal-Mart work in March of this year.  Even if DBI did not

have reason to suspect that it had lost Wal-Mart business to Clarius before December of 2005,

it knew that Clarius had been performing work for Wal-Mart when it came time to bid on Wal-

Mart accounts in 2006.  DBI thus effectively stood by while awaiting the outcome of a bidding

process in which it knew that Clarius would participate.  DBI now seeks to undo the contractual

relationship between Clarius and Wal-Mart that it effectively allowed to be created by not

seeking to remove Clarius as a bidder.  Moreover, the harm accruing from the establishment of

the contractual relationship between Clarius and Wal-Mart is limited, involving locations in only

two states.  DBI adduced no evidence that Clarius' unrestrained competition over a nearly two-

year period has damaged it in some other way.  Notably, the only customer of DBI's at the time that Plaintiff left DBI's employ from whom Clarius has obtained business is Wal-Mart.  Thus, in the unique posture of this case, it cannot be said that the breach of the restrictive covenant threatens immediate irreparable injury.  In this case, the unrestrained conduct of Clarius has caused at most some limited loss of business.

This case also is different from the ordinary factual scenario in that the evidence established that Wal-Mart had become dissatisfied with DBI's performance while Clarius was still in DBI's employ, and that Wal-Mart continued to be dissatisfied with DBI's performance after Clarius left its employ.  More importantly, the evidence presented at the preliminary injunction hearing established that DBI would not have received Wal-Mart work even if Clarius had been removed as a competitor.  Indeed, even if this Court ordered Clarius to cease doing Wal-Mart work immediately, DBI would not be selected to replace him.

In Clarke Transporation Services, supra, the evidence before the court showed that the employer had suffered substantial losses after an employee set up a competing business, purportedly in violation of a non-compete agreement.  The court declined, however, to grant preliminary injunctive relief because it was "convinced that Clarke's business and reputation was [sic] irreparably harmed by its own managerial transgressions."  2006 WL 1620175, at *2. The evidence in that case included emails and other documentation from the employer's

customers complaining of the service being provided by the employer.  Based upon this

evidence, the court concluded:

> I recognize Clarke has been placed at a competitive disadvantage
> for future transportation business with the customers [the former
> employee's] business now services and the loss of employees;
> however, I find Clarke's own mistakes significantly contributed to
> this harm.  Clarke cannot satisfy its burden to demonstrate [the
> employee's] breach of the restrictive covenants has resulted in
> irreparable harm and therefore is not entitled to preliminary
> injunctive relief.

Id. at *3.

A conclusion identical to that reached in Clarke Transportation Services is compelled

here.  While Clarius has successfully solicited some Wal-Mart storm water maintenance

business, he has not taken business away from DBI.  Wal-Mart's representative made clear

that DBI's past performance issues placed it at the bottom of the list of competitors for its storm

water maintenance work.  Indeed, the bulk of the storm water maintenance work that had been

performed for Wal-Mart by DBI has gone to another competitor (Retention Pond Services), and

Clarius had nothing to do with the loss of that work.  Wal-Mart has made clear that DBI will not

be selected to perform storm water maintenance services in the event that Clarius can no

longer perform the work.  Thus, DBI has not carried its burden of showing immediate

irreparable injury if the breach of the restrictive covenant is not restrained.

Furthermore, any harm resulting from the alleged breach of the restrictive covenants is

both measurable and compensable by a monetary damage award.  The dollar value of work

29

performed by Clarius for Wal-Mart and any other accounts is ascertainable.  DBI's profit margin

on such work is also determinable.  "Economic loss 'does not constitute irreparable harm.'"

Dice, 887 F. Supp. at 809 (quoting Acierno, 40 F.3d at 653).[5]


III.   **CONCLUSION**

"Actual proof of irreparable harm is a prerequisite to the issuance of a preliminary

injunction to enforce a covenant not to compete."  In re Arthur Treacher's Franchisee Litigation,

---

[5]That the Agreement stipulates that a breach of the restrictive covenant will cause
irreparable harm is not conclusive.  As then-District, and now Circuit Judge D. Brooks Smith
observed in Dice:

> This Court is not bound by the terms of the Employment
> Agreement in which the parties agreed that a violation of the
> covenants would constitute irreparable harm and that [the
> employer] would be entitled to an injunction.  A contractual
> provision simply cannot act as a substitute for a finding by this
> Court that it would be appropriate to invoke its equitable powers.
> '[I]t is clear that the parties to a contract cannot, by including
> certain language in the contract, create a right to injunctive relief
> where it would otherwise be inappropriate.'
>
> Although such a contractual provision may constitute evidence in
> support of a finding of irreparable harm, the mere inclusion of the
> contractual provision cannot act as a substitute for the requisite
> showing of irreparable harm.  Absent any other evidence in support
> of a showing of irreparable harm, the contractual provision in the
> Employment Agreement at issue here, standing alone, does not
> provide an adequate basis for a finding of irreparable harm.

Dice, 887 F. Supp. at 810.

537 F. Supp. 311, 323 n.31 (E.D. Pa. 1982).  Irreparable harm does not flow as a matter of course from breach of a non-compete clause.  Id.  Nor may causation be presumed.  Clarke Transportation Services, supra, 2006 WL 1620175, at *3.  In this case, DBI has not made the requisite clear showing of immediate irreparable harm attributable to any breach of the restrictive covenant if preliminary injunctive relief is not awarded.[6]  Accordingly, the motion for a preliminary injunction will be denied.  An appropriate Order follows.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

---

[6]In light of this determination, there is no need to consider the balance of equities or the public interest.

31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **DEANGELO BROTHERS, INC.** | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:CV-06-0466** |
| | : | **(CHIEF JUDGE VANASKIE)** |
| **DAVID G. CLARIUS** | : | |
| **Defendant** | : | |

**O R D E R**

**NOW, THIS 17th DAY OF AUGUST, 2006,** for the reasons set forth in the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT:**

   1.  Plaintiff's motion for a preliminary injunction is **DENIED**.

   2.  A scheduling conference will be conducted on **Thursday, September 7, 2006 at**

**8:30 a.m.** in Room 401 of the William J. Nealon Federal Bldg. & U.S. Courthouse, 235 N.

Washington Avenue, Scranton, PA.


                              s/ Thomas I. Vanaskie
                              Thomas I. Vanaskie, Chief Judge
                              Middle District of Pennsylvania